Ellen H. STUBBS, Plaintiff-Appellant,

v.

F. David MATHEWS, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 76–1388.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1977.

Jerry D. Sanders, James A. Messner, Charles C. Carter, Columbus, Ga., for plaintiff-appellant.

Ronald Knight, U. S. Atty., H. Palmer Carr, Jr., Gregory J. Leonard, Asst. U. S. Attys., Macon, Ga., for defendant-appellee.

Before TUTTLE, GOLDBERG and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

We track the language of the opinion by this Court in *Williams v. Finch,* 440 F.2d 613 (5th Cir. 1971):

"This is that somewhat unusual case in which after a careful scrutiny of the record we cannot find substantial. evidence to support the decision of the Secretary of Health, Education and Welfare, despite the stringent requirements of proof of disability under the amended Social Security Act and narrowly circumscribed function of the Court in review-

ing decisions of the Secretary." 440 F.2d 614.

The claimant, at the time a 48-year-old woman, first applied for disability insurance benefits on February 5, 1973. She described her disability as being due to "back pain and nerves." On April 28, 1973, the appellee issued a determination that she was not entitled to disability insurance benefits. On May 7, 1973, the appellant requested a reconsideration of that decision. On October 21, 1973, the appellee issued its notice of reconsideration. determination holding that the previous decision was proper. On November 28, 1973, the appellant requested a hearing before the Bureau of Hearings and Appeals. At this hearing, held on September 23, 1974, she appeared personally and was represented by counsel. On December 10, 1974, the administrative law judge issued a decision sustaining the Secretary's determination that she was not entitled to disability insurance benefits. The appeals council subsequently upheld the decision of the administrative law judge and the claimant then filed a complaint in the United States District Court which, upon motion of the Secretary, granted a summary judgment in his favor.

The hearing before the administrative law judge, which was a trial de novo consisted of consideration by the judge of all the documentary evidence that had accumulated in claimant's file, including diagnosis and reports of two certified orthopedic surgeons, diagnosis and reports of a certified psychiatrist, all of the hospital records, the testimony of the claimant herself and testimony of a qualified vocational expert.

Mrs. Stubbs painted a picture of recurring and daily pain which seriously limited her ability to stand or sit for extended periods of time, her ability to walk more than two or three blocks or to visit except in her own neighborhood and to stoop and bend. She occasionally drove the family automobile short distances and performed her household duties as she could, although she testified that she lay down more days than she stayed up, all on account of the back pains she suffered. It was undisputed

that she had complete hand and eye coordination and could see and hear without difficulty. She had a seventh grade education and had never done any work except in a textile mill.

The first doctor consulted by appellant did so upon a referral from the Georgia Department of Vocational Rehabilitation. This was Dr. Yarbrough, who made the following report on Mrs. Stubbs, following examinations made by him in November of 1972 and August 1973:

"Low back pain: This forty-five year old white female has been having back pain for some time. She was seen in my office in November, 1972, at which time she gave a history of having back pain twenty years prior to that time. The pain is off and on. It is located in the lower back. It seems that the discomfort was present all the time, but motion seemed to aggravate it.

Examination in the office did not reveal any abnormalities. She was an obese person.

X-rays revealed marked degenerative disc disease at L–5, S–1. I felt that this was probably secondary to instability and was causing most of the problem. She was followed in the office for some time and seen on numerous occasions. She was prescribed a brace but seemed to wear it off and on.

On August 5, 1973, she was seen in the Emergency Room at the Medical Center with low back pain. She had marked straight leg raising pain and pain with a cough and sneeze. At this time she was told that she would probably have to be hospitalized and this was carried out. On August 11, 1973, she was hospitalized a[t] St. Francis Hospital with low back pain. Past History: She is allergic to Sulfa, denies any serious illnesses. She had a hysterectomy. She denies TB of diabete mellitus. Review of systems are negative. Physical examination referable to back. She was an obese female. She had straight leg raising of about 50 degrees, bilaterally. She had good strength in both lower extremeties and had no senso-

ry deficits in her lower extremeties. This was to both pin prick and light touch, deep tendon reflexes and knee jerks bilaterally were two plus. At this point my diagnosis was lumbar instability. Since that time examinations have not changed. Her symptoms are much less at this time. She has been maintained on bed rest, abdominal flexion exercises and a brace. She has been followed in the office periodically. She was last seen here in the office on September 11, 1973. She will return to the office in approximately one month. Disability, permanent, 100% secondary to low back pain and degenrative disc disease."

The second orthopedic surgeon who examined the claimant was Dr. J. C. Serrato, Jr., who examined her in preparation for the hearing. His report to claimant's counsel is as follows:

"This is to advise that I have examined the above captioned patient who has chronic degenerative disc disease of the lumbosacral spine, severe and symptomatic. She has a great deal of discomfort with her back and her gait is very slow and protective. I feel this patient would be a very good candidate for some type of stabilizing procedure to her spine.

It is further my opinion that this patient is totally and permanently incapacitated to perform any type of gainful occupation."

It is perhaps necessary to add that in her testimony, Mrs. Stubbs stated that she was informed by Dr. Yarbrough that if she had consented to surgery as recommended by him she might be faced with the problem of never being able to walk. She also testified, more explicitly, that she was unable to do all of her housework, she could not mop or wax her floors and she performed her household duties intermittently although she did normally rise at 6 o'clock in the morning and prepare breakfast. The trial judge commented on the fact that he had seen her walk into the courtroom and he observed her during the giving of her testimony. When he commented on this, Mrs. Stubbs commented that she had had to

change her position while sitting in the witness chair on account of pain.

The Secretary presented one witness who was qualified by the judge as a vocational expert. He then presented her two sets of hypotheses in order to elicit her opinion as to whether the claimant would be able to carry on any gainful occupation in a type of job generally available throughout the country. The questions and the witness' answers were as follows:

"Q. Mrs. Meeks, let me assume that— that you—you have been here, have you not, throughout this entire hearing?

A. Yes.

Q. Heard every word that's been said and every question that's been asked and every answer given?

A. Yes.

Q. All right. Now let me assume, Mrs. Meeks, that Mrs. Stubbs has all the limitations and restrictions and the pain that she says she has in—in her testimony here today. Now, assuming these limitations, is there any type of work existing in this region that she can do?

A. I would say, under that assumption Judge, no, there would be no job she could do.

Q. All right, ma'am. Now, again, Mrs. Meeks, I want you to consider Mrs. Stubbs' education and her past work experience and also the testimony that she has given here today. I also want you—at least my understanding is that she has at least completed the sixth grade, and she has entered the seventh grade. ¶ She is now 47 years of age and will be 48 in December. She has worked in the textile industry all of her life; and most all of her work has been requiring, as I understand it, either production type work which requires standing, bending, stooping, reaching, and those type things.

Now, assume, Mrs. Meeks, that I find that Mrs. Stubbs can sit for at least an hour, that she does have complete hand/eye coordination, that she can

walk, that she can bend over some, and that she can see all right and hear all right. With those assumptions, Mrs. Meeks, and considering her education, and work experience, and training, as I told you, is there—are there any types of work existing in this economy that she can do?

A. Well, Judge Smith, under this assumption, I would say there wuld be some jobs that she could perform and the duties of that would be sedentary and light.

Q. Sedentary and light work. All right. Mrs. Meeks could you tell us: are these jobs—do you know what they are, please ma'am?"

The witness then went on to say that she could be a cashier in a restaurant or a cafeteria or in a laundry or a movie theater; that she could be a receptionist in a beauty parlor or a receptionist in an eating establishment of the fast food variety; that she could be an inspector, inspecting gloves like surgical plants use and that she could be a "hand packer" or a "band turner" or a "pocket turner" in a garment factory "where she could sit and do that all the time." Mrs. Meeks testified that these categories of jobs were taken from a recent survey made by the Georgia State Employment Service, Department of Labor.

■ The burden of a claimant to cause the Court to overrule the Secretary's finding that she has failed in her burden of proof is a heavy one under the Act. *See Williams v. Finch, supra; Brown v. Finch,* 429 F.2d 80, 83 (5th Cir. 1970). As we stated in the *Williams* case:

"Disabling impairments must be of lengthy and indefinite duration (footnote omitted). Moreover, under the Act as amended, the requirement that an applicant show that he cannot engage in 'substantial gainful work which exists in the national economy, regardless of whether * * * he would be hired if he applied for work (footnote omitted) . . .' We are also aware that we may neither reweigh the evidence nor substitute our judgment for that of the Secretary. Our

role, as we have so often said, is strictly limited to a determination of whether there is substantial evidence in the record to support the Secretary's decision (citing numerous cases). As a consequence of our circumscribed function and the strict standards for proof of disability exacted by the amended Act, the number of judicial opinions approving these administrative decisions which deny disability benefits is overwhelming. Conversely, reversals are very rare. This is not to say, however, that we have abdicated our traditional judicial function of scrutinizing the record as a whole to determine the reasonableness of the decision reached. Nor is it to say that there can never be a case requiring reversal because of the usual finality accorded such decisions and the narrow scope of judicial review. *See, e. g., N.L.R.B. v. Ortronix, Inc.,* 5th Cir. 1967, 380 F.2d 737. . . ."

This, in our opinion, is such a case.

■ Putting to one side any contention that Mrs. Stubbs' nervous condition contributed to her disability, since we agree that there was ample basis for the administrative law judge's finding that she was not suffering from any psychiatric disorder, we find another similarity to the fact situation in the *Williams* case which we have cited so extensively. Here, all the medical evidence was to the effect that Mrs. Stubbs was "totally disabled"—in the one instance Dr. Yarbrough said "disability, permanent, 100% secondary to low back pain and degenerative disc disease." Dr. Serrato said: "It is further my opinion that this patient is totally and permanently incapacitated to perform any type of gainful occupation." While we recognize that a physician's diagnosis of total disability may have been given without reference to the statutory standard, the words have a generally accepted meaning which, if not to be taken as true in the technical sense of the statute are subject to inquiry by cross-examination of the doctors. No effort was made here to examine the attending physicians as to their precise meaning when they described Mrs. Stubbs as totally disabled. In this respect, the facts here are even stronger for the

claimant than those in *Williams.* There, the four doctors used the following language:

"(1) 'He should perform only light duties . . . . . It would appear that Mr. Williams is disabled with reference to gainful work.'

(2) 'The applicant suffers from a significant impairment and may well be disabled at the present time.'

(3) 'It is my impression that this patient is partially disabled on the basis of hypertensive vascular disease and probably mild anginal failure.'

(4) 'In my opinion, the patient at this time is unable to work for the following reasons . . . .' "

Nevertheless, this Court in the *Williams* case, stated:

"The salient feature of this case, which sets it apart from the usual Social Security disability case, is that there is no statement of record by any medical expert that claimant is *not physically disabled.*" (Emphasis in original).

Here, no medical witness, and no other witness having knowledge of more objective means of observing Mrs. Stubbs' activities, was heard to say that she was not physically disabled from the disc deterioration which the doctors found to exist and its attendant pain which the orthopedic specialist identified as "degenerative disc disease at L–5, S–1." The later report, following a visit immediately prior to the hearing spoke of the disease as "severe and symptomatic" and stated: "She has a great deal of discomfort with her back and her gait is very slow and protective."

Mrs. Stubbs testified that she was fired from her job because of a dispute she got into with a supervisor resulting from the same pain in her back which has now been diagnosed as described above. It is necessary to refer to this part of the record, because the judge made a Finding of Fact No. 6 as follows: "Claimant did not stop working because of a disability, but due to a misunderstanding between claimant and her supervisor." Testimony with respect to this matter is as follows:

"Q. And what happened to you now, please. . . . ?

A. Well, they—my job, of course, with all the bending and stooping that I was having to do, it was—it was really giving me fits with my back and I suppose that with my back hurting me so well, it was causing my nerves to . . . to be on edge and so I tried to explain it to my boss man and so he told me, you know, that if I didn't want to work or whatever—he just didn't, you know, seem to want to understand.

Of course, me and my head inspector, we had, well, I'd say, a misunderstanding that day because of me feeling like I did and everything.

And so I told her, you know, that I was going to tell the boss man and so she said she was going, too, so we went and talked to the boss man.

And so he just told me, he said 'Well' he said 'If you don't want to work' I mean 'don't want to work why don't you quit?'

So what do I do? I mean, I—I'm stunned, you know, because I was trying to explain to him, and he just didn't seem like at the time he understood.

And so I just said 'Well,' I said 'If you don't want me' I had already worked there almost four years. I had already worked there almost four years. Going on four years.

And he said 'Well' he said, I told him that if he didn't—if he didn't want me to work there, why didn't he fire me? Because, really, I didn't know anything else to say and I didn't really think that he would take me serious because I didn't mean it.

Q. Yes ma'am.

A. And I even asked him after he told me, you know, 'all right, that's what I'll do.'

That was the way I was discharged from my job."

Furthermore, the judge in explaining the basis of his decision stated: "Claimant can walk, stoop, sit and has good hand and eye coordination." This statement, as made, is not accurate, according to any evidence in the record. According to the claimant's undisputed testimony, her walking was severely limited and Dr. Serrato's report stated: "She has a great deal of discomfort with her back and her gait is very slow and protective." Moreover, the statement overlooks the limitations on her ability to both stoop and sit which were testified to without dispute.

■ Moreover, the answers of the vocational expert given in response to hypothetical questions by the judge, are not sufficient, even though we were to hold that they could outweigh the undisputed medical and lay testimony as to the clinical facts and pain because of the inadequacy of the assumptions upon which they were based.

The judge first put the question: "Now let me assume, Mrs. Meeks, that Mrs. Stubbs has all the limitations and restrictions and the pain that she says she has in—in her testimony here today. Now, assuming these limitations, is there any type of work existing in this region that she can do? Answer: I would say, under that assumption, judge, no, there would be no job she could do."

The judge then tried again and the following took place:

"Q. All right, ma'am now, again, Mrs. Meeks, I want you to consider Mrs. Stubbs' education and her past work experience and also the testimony that she has given here today. I also want you—at least my understanding is that she has at least completed the sixth grade and she has entered the seventh grade.

She is now 47 years of age and will be 48 in December. She has worked in the textile industry all of her life; and most all of her work has been requiring, as I understand it, either production type work which requires standing, bending, stooping, reaching, and those type things.

Now assume, Mrs. Meeks, that I find that Mrs. Stubbs can sit for at least an hour, that she does have complete hand/eye coordination, that she can

walk, that she can bend over some, and that she can see all right and hear all right. With those assumptions, Mrs. Meeks, and considering her education, and work experience, and training, as I told you is there—are there any types of work existing in this economy that she can do?

A. Well, Judge Smith, under this assumption I would say there would be some jobs that she could perform the duties of that would be sedentary and light."

The obvious difficulty with this second question is that, having left out of the assumption that part of the first question in which the judge mentioned "all the limitations and restrictions and the pain that she says she has" and by making reference to the fact that "Mrs. Stubbs can sit for at least an hour, that she does have complete hand/eye coordination, that she can walk, and that she can bend over some, and that she can see all right and hear all right" the expert, it seems to us, was bound to assume that the element of pain in performing any of these operations was eliminated. Otherwise, it is impossible to understand how the witness could give a different answer in the second assumption than the first, because all of the facts stated by the judge in his second assumption were comprehended within the first, since it appears that the trial court expected Mrs. Meeks to answer in light of "every question that's been asked and every answer given."

In any event, even though the evidence of pain is necessarily largely subjective, there is evidence here of ample objective facts as to the limits of Mrs. Stubbs' physical activity that could be readily disproved if not true as testified to by the witness. Instead, her testimony as to the pain is supported by the observations of both of the doctors who treated her.

Significantly, here the trier of the facts did not make a specific finding that the asserted pain did not exist or that it was not severely limiting in Mrs. Stubbs' activi-

ties. *Cf. Halsey v. Richardson,* 441 F.2d 1230 (6th Cir. 1971).

 Our responsibility with respect to review of the Secretary's determination in this type of case is the same as that of the district court. We view the record made before the administrative officials to determine whether the Secretary's decision is supported by substantial evidence on the record as a whole. Having concluded that it is not thus supported, it necessarily follows that we hold that the trial court erred in granting summary judgment for the Secretary.

The judgment is reversed and the case is remanded to the district court so that it may issue an appropriate order directing the Secretary to grant appellant the disability benefits to which she is entitled, in accordance with this opinion.

REVERSED and REMANDED.